❏ Original  ❏ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>1139 South 23rd Street, Milwaukee,<br>Wisconsin, as further described in Attachment<br>A. | )<br>)<br>)<br>)  Case No.  21-1036M(NJ)<br>)<br>)<br>) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:  Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Eastern_____ District of _____Wisconsin_____ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before _____12/31/2021_____ *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m.  ❏ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Hon. Nancy Joseph_____ .
*(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❏ for _____ days *(not to exceed 30)*  ❏ until, the facts justifying, the later specific date of _____ .

Date and time issued:  _____12/17/2021 @ 2:45 p.m._____

*Judge's signature*

City and state:  _____Milwaukee, Wisconsin_____  _____Hon. Nancy Joseph, Magistrate Judge_____
*Printed name and title*

| **Return** |||
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

---

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**

**PLACE TO BE SEARCHED**

    **1139 South 23rd Street, Milwaukee, Wisconsin:** This address is utilized by Erick R. Ramirez. Described as a two story, single family residence, having light tan vinyl siding on the first story and yellow vinyl siding on the second story, with white trim and light green front porch. The numbers ""1139"" are displayed in a vertical fashion on the east face of the residence. The front door is located on the east face of the residence. Pictures of the residence exterior follows:





# ATTACHMENT B

## ITEMS TO BE SEIZED

All records relating to violations of 21 U.S.C. §§ 841(a)(1), including but not limited to:

All bank records, checks, credit card bills, account information, and other financial records;

Financial records, documents, statements, or other evidence of control of bank or other financial accounts and investment funds;

Lists of drug customers and related identifying information;

Types, amounts, and prices of drugs trafficked, as well as dated, places, and amounts of specific transactions;

Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

Indicia of residency;

Safes, vaults, or lock boxes used to store proceeds or records from these crimes;

U.S. Currency; and

Cellular telephones and all electronic storage areas on the device including stored telephone numbers, recently called numbers list, text messages, digital audio and or video recordings, pictures, settings, and any other user defined settings and/ or data.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | | |
|---|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>1139 South 23rd Street, Milwaukee, Wisconsin, as<br>further described in Attachment A. | )<br>)<br>)<br>)<br>)<br>) | Case No.   21-1036M(NJ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ Eastern _____ District of _____ Wisconsin _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Sections 841 | Distribution and possession with intent to distribute controlled substances. |

The application is based on these facts:

See the attached affidavit.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

ALEXANDER ERLIEN
Digitally signed by ALEXANDER ERLIEN
Date: 2021.12.17 14:06:05 -06'00'

*Applicant's signature*

ATF SA Alexander Erlien

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____ telephone _____ *(specify reliable electronic means)*.

Date:  12/17/2021

*Judge's signature*

City and state:  Milwaukee, Wisconsin

Hon. Nancy Joseph, Magistrate Judge

*Printed name and title*

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Alexander W Erlien, being first duly sworn, hereby depose and state as follows:

## I. INTRODUCTION, BACKGROUND, TRAINING, AND EXPERIENCE

1.      I have been a Special Agent with the ATF since September 26, 2018. I was previously employed as Police Officer for the City of Janesville, Wisconsin for approximately five and a half years, and prior to that, I was an Officer in the United States Navy for approximately five years. I have a bachelor's degree in philosophy from the University of Wisconsin – Madison. I have been involved in numerous investigations involving violations of firearms laws, drug trafficking, human trafficking, and drug possession, resulting in the arrest of numerous criminal defendants and the seizure of illegal firearms and illicit controlled substances.

2.      I have received training in the investigation of unlawful possession of firearms and possession of firearms by prohibited persons, as well as drug trafficking and related offenses. I have been trained regarding these offenses and has arrested individuals for federal firearms related offenses, as well as drug trafficking offenses. I have also investigated drug trafficking offenses at the state and federal level, including violations of Title 21, United States Code, Sections 841, 846, and 856.  I know from training and experience that those that commit crimes commonly communicate, photograph, videotape, and organize using electronic devices, including by phone call, text message, electronic mail, messaging application, and social media.

3.      I have participated in numerous investigations involving the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these devices. I have also participated in investigations involving the use of historical and prospective location information to identify targets, map patterns of travel, corroborate other evidence, and apprehend persons to be arrested. On numerous occasions, this electronic evidence has provided proof of the crimes being investigated and corroborated

1

information already known or suspected by law enforcement. During the course of my investigations, I have regularly used electronic evidence relating to the commission of criminal offenses, including intent, motive, manner, means, and the identity of co-conspirators.

4.     I have participated in the execution of numerous search warrants in which weapons, narcotics, and/or evidence of drug trafficking were seized. I am familiar with the different types and calibers of firearms and ammunition commonly possessed for illegal purposes, as well as the methods used to conduct narcotics trafficking.

5.     I have had both formal training and have participated in numerous complex drug trafficking investigations.  I have received training in the investigation of unlawful possession of firearms, drug trafficking, money laundering, financial investigations, and computer crimes. My training and experience include the following:

a.     Through informant interviews and extensive debriefings of individuals involved in firearms and drug trafficking, I have learned about the manner in which individuals and organizations finance, source, purchase, transport, and distribute firearms and controlled substances in Wisconsin, throughout the United States, and internationally.

b.     I have used my training and experience to locate, identify, and seize multiple types of firearms, narcotics, drugs, drug proceeds, and drug contraband.

c.     I have also relied upon informants to obtain firearms and controlled substances from firearms and drug traffickers and have made undercover purchases of firearms and controlled substances.

d.     I have extensive experience conducting street surveillance of individuals engaged in firearm and drug trafficking. I have participated in the execution of numerous search warrants where firearms, controlled substances, drug paraphernalia, and drug trafficking records were seized.

e.     I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine, cocaine base (unless otherwise noted, all references to crack cocaine in this affidavit is cocaine base in the form of crack cocaine), ecstasy, and methamphetamine. I am familiar with the methods used by drug traffickers to package and prepare controlled

2

substances for sale. I know the street values of different quantities of the various controlled substances.

f.    I am familiar with the language used over the telephone and other electronic communications to discuss firearm and drug trafficking and know that the language is often limited, guarded, and coded. I know the various code names used to describe firearms and controlled substances. I also know that firearm and drug traffickers often use electronic devices (such as computers and cellular phones), electronic communication services (such as e-mail and messaging services), and social media to facilitate these crimes.

g.    I know firearm and drug traffickers often register phones, mailboxes, bank accounts, electronic communication services, and other instrumentalities of drug trafficking in the names of others, also known as nominees, to distance themselves from instrumentalities used to facilitate drug trafficking.

h.    I know that firearm and drug traffickers often use electronic equipment and wireless and landline telephones to conduct trafficking operations.

i.    I know that firearm and drug traffickers often keep documents and records about the transportation, sourcing, ordering, sale, and distribution of controlled substances and firearms. I know these records can be kept on electronic devices or physical document. These items are maintained by the traffickers within residences, businesses or other locations over which they maintain dominion and control.

j.    I know that firearm and drug traffickers often use their proceeds to purchase assets such as vehicles, property, and jewelry. I also know that firearm and drug traffickers often use nominees to purchase or title these assets in order to avoid scrutiny from law enforcement officials. I know that firearm and drug traffickers often secure proceeds from their illegal sales at locations within their dominion and control, such as their residences, businesses, other locations over which they maintain dominion and control and storage facilities, and in safes or other secure containers.

k.    I know that firearm and drug traffickers often attempt to protect and conceal illegally obtained proceeds through money laundering, including but not limited to domestic and international banks, securities brokers, service professionals such as attorneys and accountants, casinos, real estate, shell corporations, business fronts, and otherwise legitimate businesses which generate large quantities of currency. I know it is common for firearm and drug traffickers to obtain, secrete, transfer, conceal, or spend proceeds, such as currency, financial instruments, precious metals, gemstones, jewelry, books, real estate, and vehicles. I know it is common for firearm and drug traffickers to maintain documents and records of these illegally obtained proceeds, such as bank records, passbooks, money drafts, transaction records, letters of credit, money orders, bank drafts, titles, ownership

3

documents, cashier's checks, bank checks, safe deposit box keys, money wrappers, and other documents relating to the purchase of financial instruments or the transfer of funds. I know firearm and drug traffickers often purchase or title assets in fictitious names, aliases, or the names of relatives, associates, or business entities to avoid detection of these assets by government agencies. I know that even though these assets are titled or purchases by nominees, the firearm and drug traffickers actually own, use, and exercise dominion and control over these assets. The aforementioned books, records, receipts, notes, ledgers, and other documents are often maintained where the traffickers have ready access. These may be stored in hard copy or soft copy on paper, computers, cellular devices, and other electronic media or electronic storage devices. These items are maintained by the traffickers within residences, businesses or other locations over which they maintain dominion and control.

l.      I know firearm and drug traffickers maintain large amounts of currency, including in readily accessible financial accounts, to finance their ongoing drug business. I know that those involved in firearm and drug trafficking or money laundering keep records of their transactions. Because firearm and drug trafficking generates large sums of cash, traffickers often keep detailed records about the distribution of narcotics and the laundering of proceeds. I also know that firearm and drug trafficking and money laundering activities require the cooperation, association, and communication between and among a number of people. As a result, people who traffic in firearms, narcotics or launder money for such organizations possess documents that identify other members of their organization, such as telephone books, address books, handwritten notations, telephone bills, and documents containing lists of names and addresses of criminal associates. Such records also provide information about the identities of coconspirators who launder money and traffic drugs and firearms. I also know that firearm and drug traffickers commonly maintain addresses or telephone numbers which reflect names, addresses, or telephone numbers of their firearm and drug trafficking and money laundering associates in hard copy and soft copy on papers, books, computers, cellular devices, and other electronic media or electronic storage devices. Again, these items are maintained by the traffickers within residences, businesses or other locations over which they maintain dominion and control.

m.      I know firearm and drug traffickers often use electronic devices, such as telephones, cellular devices, computers, and currency counting machines to generate, transfer, count, record, or store the information described above and conduct firearm and drug trafficking and money laundering. I am familiar with computers, cellular devices, pagers, and other electronic media or electronic storage devices and their uses by firearm and drug traffickers to communicate with suppliers, customers, co-conspirators, and fellow traffickers. These devices often contain evidence of illegal activities in the form of communication records, voicemail, email, text messages,

4

video and audio clips, location information, business records, and transaction records. I know firearm and drug traffickers take, store, preserve, or maintain photographs or videos of themselves, their associates, their property, their firearms, their drugs, and their drug proceeds. These traffickers usually maintain these photographs or videos on computers, cellular devices, and other electronic media or electronic storage devices. Based upon my training and experience, I know that computer hardware and software may be important to a criminal investigation in two distinct and important respects: (1) the objects themselves may be instrumentalities, fruits, or evidence of crime; and (2) the objects may have been used to collect and store information about crimes. I know the following information can be retrieved to show evidence of use of a computer or smartphone to further the drug trade: system components, input devices, output devices, data storage devices, data transmission devices, and network devices and any data contained within such systems; computer media and any data contained within such media; operating system software, application or access program disks, manuals, books, brochures, or notes, computer access codes, user names, log files, configuration files, passwords, screen names, email addresses, IP addresses, and SIM cards.

n.    I have participated in numerous firearm and drug trafficking investigations involving the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these devices. This has led to evidence of the crimes under investigation and corroborated information already known or suspected by law enforcement. I have regularly used electronic evidence to find proof relating to the commission of criminal offenses, including intent, motive, manner, means, and the identity of suspects and conspirators.

o.    I have also participated in the execution of numerous premises search warrants and arrests, where controlled substances, firearms, drug paraphernalia, drug proceeds, electronic devices, and records relating drug trafficking and drug proceeds were seized. I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such.

6.    SA Dalton Evertz with the ATF performed various investigative tasks in this matter, including several undercover operations. SA Evertz is employed as a special agent with the ATF and has been since October 2018. SA Evertz received extensive training at the Federal Law Enforcement Training Center in Glynco, GA. SA Evertz attended the Criminal Investigator Training Program, as well as ATF's Special Agent Training Program. SA Evertz has received

5

training in the investigation of violations of firearms laws, firearm and drug trafficking, and drug possession. SA Evertz has gained experience in the conduct of such investigations through previous case investigations, formal training, and in consultation with law enforcement partners in local, state, and federal law enforcement agencies. Prior to becoming a special agent with the ATF, SA Evertz received a bachelor's degrees from the University of Wisconsin – Eau Claire in the field of Criminal Justice. I have discussed and participated this investigation with SA Evertz.

7. I am currently participating in an investigation regarding the sale of cocaine in the Milwaukee, Wisconsin involving Yesenia VILLARREAL (VILLARREAL) (DOB: XX/XX/1994), Erick R. RAMIREZ (DOB: XX/XX/1994) among others. I am familiar with the facts and circumstances regarding this investigation as a result of my personal participation in this investigation, and my review of: (a) consensually recorded telephone conversations and face-to-face meetings; (b) reports prepared by, and information obtained from, other federal, state, and local law enforcement agents and officers; and (c) information obtained from undercover controlled buys by SA Evertz.

8. This affidavit is based upon my personal knowledge, and upon information reported to me by other federal, state, and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation. This affidavit is also based upon information gained from interviews with witnesses whose reliability is established separately herein.

9. The investigation to date has included traditional law enforcement methods, including, but not limited to: information from other law enforcement officers; recorded

conversations; undercover controlled buys; physical surveillance; telephone records; electronic surveillance; and physical seizures. However, because this affidavit is submitted for the limited purpose of securing authorization for search warrants, I have not included each fact known to me concerning this investigation. I have set forth only the facts that I believe are essential to establish the necessary foundation for the requested search warrants.

## II.   PURPOSE OF AFFIDAVIT

10.    This affidavit is submitted in support of an application for a search warrant to seek evidence of distribution, and possession with intent to distribute cocaine, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(B), for the location described below, which is associated with Erick R. RAMIREZ, who has and will continue to commit the above-listed offenses:

- **1139 South 23rd Street, Milwaukee, Wisconsin:** This address is utilized by Erick R. Ramirez. Described as a two story, single family residence, having light tan vinyl siding on the first story and yellow vinyl siding on the second story, with white trim and light green front porch. The numbers ""1139"" are displayed in a vertical fashion on the east face of the residence. The front door is located on the east face of the residence.

## III.   PROBABLE CAUSE

### A.  Background and Summary of Investigation

11.    Beginning in March 2021, ATF began investigating Yesenia VILLARREAL (VILLARREAL) (DOB: XX/XX/1994), Erick R. RAMIREZ (DOB: XX/XX/1994), and others for their participation in the sale of crack cocaine in Milwaukee, Wisconsin. Case agents utilized different tactics during the investigation including recorded conversations, undercover controlled buys, physical surveillance, telephone records, electronic surveillance, and physical seizures.

12.    During the investigation, VILLARREAL engaged in multiple undercover controlled buys, in which at times VILLARREAL sold over 50 grams of crack cocaine to ATF SA

7

Dalton Evertz, who was undercover. During one undercover controlled buy RAMIREZ was present and assisted in preparing the crack cocaine for the sale to SA Evertz. As the investigation continued attempts were made by case agents to purchase crack cocaine directly from VILLAREEAL's source, RAMIREZ. These attempts failed. Eventually VILLARREAL was made aware of the investigation and provided a Mirandize statement in which VILLARREAL admitted to participating in the multiple undercover controlled buys of crack cocaine to SA Evertz. VILLARREAL further stated RAMIREZ was her source of supply for the crack cocaine VILLARREAL sold during the undercover controlled buys.

### B. Meeting Villarreal

13.     Beginning in March 20021, SA Dalton Evertz, utilizing an undercover social media persona, began following an Instagram account with the vanity name "Yesenia 🏳️ 🏳️" and username "yeya_v13." Case agents later identified the Instagram user as VILLARREAL.

14.     After SA Evertz began following VILLARREAL on Instagram, SA Evertz observed VILLARREAL advertised her Snapchat username, "yeya94," within her Instagram "bio." SA Evertz and I know that Instagram users often share links and usernames for their other social media accounts within their Instagram biography section (referred to as a user's "bio"). SA Evertz, utilizing an undercover Snapchat account, then added VILLARREAL as a friend on Snapchat.

15.     After VILLARREAL accepted SA Evertz' Snapchat friend request, VILLARREAL sent SA Evertz messages, via Snapchat, about purchasing firearms. VILLARREAL explained that she currently owns a .22 caliber rifle; however, she wanted to obtain a handgun, because she wanted something smaller, which would be easier to conceal. During the course of the conversation, SA Evertz asked VILLARREAL why she would not go to a gun store

to purchase firearms. VILLARREAL responded she did not want to purchase the firearms from a gun store because she did not want the firearms she purchased to be traced back to her by law enforcement. SA Evertz and I know that when an individual purchases a firearm from a Federal Firearms Licensee (FFL), the individual completes a Firearms Transaction Record Form, commonly referred to as ATF Form 4473. The completion of this Form allows ATF to trace a firearm recovered by law enforcement back to the original purchaser. Based on my training and experience, I know it is common for individuals involved in criminal activity and utilizing firearms to avoid purchasing firearms from a FFL in order to evade law enforcement detection.

16.     VILLARREAL later asked SA Evertz if SA Evertz would be able to obtain and sell firearms to VILLARREAL. VILLARREAL specifically asked if SA Evertz could obtain a "Smith & Wesson." SA Evertz stated SA Evertz may be able to sell VILLARREAL firearms in the future; however, SA Evertz had no surplus firearms available to be sold at that time. SA Evertz then asked VILLARREAL if she would be willing to "trade" firearms for "girl" in the future. SA Evertz and I know that "girl" is street vernacular commonly used to refer to cocaine. VILLARREAL responded she could provide amounts of cocaine to SA Evertz. SA Evertz then asked if VILLARREAL could provide SA Evertz with "hard", which I know that "hard" is street vernacular commonly used to refer to crack cocaine. VILLARREAL explained she could provide SA Evertz with crack cocaine at a rate of $1,300 per ounce.

**C. Undercover Controlled Buys**

17.     SA Evertz conducted several undercover controlled buys with VILLARREAL. During some of the undercover controlled buys, SA Evertz attempted to learn VILLARREAL's source of crack cocaine and made attempts to meet with VILLARREAL's source.

9

18.     During the below listed undercover controlled buys of controlled substances, SA Evertz placed a recorded phone call or sent text messages to VILLARREAL's cellphone or social media.  The undercover controlled buys were conducted using surveillance, including audio-/video-recording/transmitting devices, and ATF pre-recorded buy money. Additionally, the controlled substances were all weighed and tested positive for the listed substance using Nark II test kits following the printed instructions

   a.  **April 5, 2021 – "Tester" .15 grams crack cocaine**

19.     On March 31, 2021, SA Evertz contacted VILLARREAL via Snapchat and asked to obtain one ounce of crack cocaine from VILLARREAL. VILLARREAL replied she would provide SA Evertz a "tester" before she provided SA Evertz with an ounce. SA Evertz and I know that drug dealers commonly provide "samples" or "testers" of narcotics to potential customers so the customer can ensure the quality of the dealer's product before purchasing larger amounts. SA Evertz then provided his cell phone number to VILLARREAL and asked VILLARREAL to contact SA Evertz via text message to coordinate VILLARREAL providing the "tester" to SA Evertz. A short time later, SA Evertz received a text message from telephone number 414-248-0793, which stated, "It's yesi."

20.     On April 4, 2021, SA Evertz communicated with VILLARREAL using telephone number 414-248-0793 via text message to arrange a transaction for crack cocaine the following day. Over the course of the text message conversation, VILLARREAL stated, "Hope this is the start of a long term businessship lol."

21.     On April 5, 2021, SA Evertz communicated with VILLARREAL via telephone number 414-248-0793 via text message and telephone calls to arrange the transaction for crack cocaine. VILLARREAL stated, in substance, that she was in communication with her source of

10

narcotics to obtain the "tester" for SA Evertz. VILLARREAL explained once her source dropped off the narcotics at her house, she would meet with SA Evertz at Walmart, located at 401 East Capitol Drive, Milwaukee, Wisconsin (WI).

22.     Continuing on April 5, 2021, VILLARREAL called SA Evertz using telephone number 414-248-0793 and explained she had obtained the crack cocaine from her source. VILLARREAL also apologized for her tardiness and explained she was delayed due to VILLARREAL having to meet her source "halfway" to obtain the crack cocaine. VILLARREAL stated she would soon be arriving at Walmart in a "gray Honda."

23.     At approximately 9:45 P.M., VILLARREAL arrived at Walmart in a gray Honda sedan and provided a small amount of suspected crack cocaine to SA Evertz. After VILLARREAL provided the suspected crack cocaine to SA Evertz, VILLARREAL boasted, "That's not the only thing I got." VILLARREAL stated, in substance, that she several sources of narcotics who have "top shelf." SA Evertz and I understood this to mean VILLARREAL was connected to several sources of narcotics who sell various high-quality controlled substances.

24.     After the operation, ATF Agents weighed and field-tested the suspected crack cocaine. The substance weighed 0.15 grams and field-tested positive for cocaine.

**b. April 8, 2021 – 3.87 grams crack cocaine**

25.     Beginning April 7, 2021, SA Evertz communicated with VILLARREAL via text message using telephone number 414-248-0793 to coordinate the purchase of 3.5 grams of crack cocaine from VILLARREAL. Over the course of the conversation, VILLARREAL stated she would sell the 3.5 grams to SA Evertz for $375. VILLARREAL also explained the 3.5 grams SA Evertz intended to purchase was coming from the same source that provided the "tester."

11

VILLARREAL and SA Evertz arranged to conduct the transaction at Walmart, located at 4140 West Greenfield Avenue, West Milwaukee, WI, the following day.

26.     On April 8, 2021, SA Evertz communicated with VILLARREAL via text message using telephone number 414-248-0793 to coordinate the meeting between VILLARREAL and SA Evertz. At approximately 10:56 A.M., VILLARREAL met with SA Evertz in an undercover vehicle and provided SA Evertz with an amount of suspected crack cocaine in exchange for $375 (Figure 1). After the transaction was completed, ATF Agents observed VILLARREAL travel to 2202 South 26th Street, Milwaukee, WI in her gray Honda sedan.



*(Figure 1)*
*VILLARREAL holding the suspected crack cocaine (circled in red) prior to providing the substance to SA Evertz.*

27.     After the operation was completed, ATF Agents weighed and field-tested the substance. The substance weighed 3.87 grams with packaging and field-tested positive for cocaine.

### c. May 12, 2021 – 30.74 grams crack cocaine

28.     Beginning April 12, 2021, SA Evertz communicated with VILLARREAL via text message using telephone number 414-248-0793 to discuss future purchases of crack cocaine by SA Evertz from VILLARREAL. Over the course of the conversation, VILLARREAL explained she would charge SA Evertz $3,000 for one ounce of cocaine. VILLARREAL stated although she

originally told SA Evertz that VILLARREAL would only charge $1,300 per ounce, the crack cocaine VILLARREAL would provide SA Evertz was better-quality than the crack cocaine that cost $1,300 per ounce. VILLARREAL further explained as SA Evertz continued to purchase narcotics from VILLARREAL, the price would decrease. After SA Evertz told VILLARREAL that $3,000 per ounce was too expensive, VILLARREAL stated she spoke with her source and her source agreed to sell crack cocaine to SA Evertz at a rate of $2,700 per ounce. VILLARREAL informed SA Evertz, "U won't find what I have for less."

29.    On May 3, 2021, SA Evertz communicated with VILLARREAL via Snapchat, user account yeya94, to coordinate and arrange the purchase of crack cocaine by SA Evertz from VILLARREAL. Over the course of the communications, VILLARREAL stated the price for an ounce of crack cocaine remained at $2,700. SA Evertz then agreed to pay the amount and asked if VILLARREAL could provide the ounce of crack cocaine to SA Evertz the following day. VILLARREAL replied, "Imma try let me figure something out."

30.    On May 4, 2021, SA Evertz continued to communicate with VILLARREAL via Snapchat, user account, regarding the sale of one ounce of crack cocaine. VILLARREAL stated she was still waiting to hear back from her source. VILLARREAL stated her source "Might be on work trip rn." Based on training and experience, SA Evertz and I understood this to mean VILLARREAL's source of narcotics was in the process of obtaining narcotics from a location not near Milwaukee, WI. SA Evertz then asked, "Lol ok U tried calling him?" VILLARREAL responded, "Yea." SA Evertz ultimately informed VILLARREAL he would contact VILLARREAL at a later time to arrange the purchase of the narcotics.

31.    On May 10, 2021, SA Evertz again contacted VILLARREAL via Snapchat, user account yeaya94, to discuss the purchase of crack cocaine by SA Evertz from VILLARREAL.

VILLARREAL responded, "Ok yea lmk how much u wanna do it gotta grab cash to grab it." SA Evertz then replied SA Evertz desired to purchase one ounce of crack cocaine from VILLARREAL. VILLARREAL responded, "Ok I hear u let me put this together usual pick n save right." SA Evertz and VILLARREAL ultimately agreed conduct the transaction the following day at Walmart, located at 4140 W Greenfield Avenue, West Milwaukee, WI.

32.     On May 12, 2021, SA Evertz and VILLARREAL communicated via Snapchat, user account yeya94, to coordinate the purchase of one ounce of crack cocaine by SA Evertz from VILLARREAL. At approximately 8:55 A.M., SA Evertz asked, "About to head into work we still good for later?" VILLARREAL responded, "Yea just lmk" (let me know).

33.     Continuing on May 12, 2021, beginning at approximately 4:28 P.M., SA Evertz communicated with VILLARREAL via text message and telephone calls using telephone number 414-248-0798 regarding the anticipated purchase of one ounce of crack cocaine. VILLARREAL stated she could not meet with SA Evertz at Walmart until later due to childcare issues. SA Evertz then offered to meet VILLARREAL at her residence to conduct the transaction. At approximately 4:28 P.M., VILLARREAL texted SA Evertz, "U can come get it at my crib but not ready had to make fresh batch." Based on training and experience, SA Evertz and I understood this to mean VILLARREAL was currently in the process of manufacturing the crack cocaine to be purchased by SA Evertz. Several minutes later, VILLARREAL texted SA Evertz "It's gonna get brought here. That's what I'm saying if you want it you can come get it here." VILLARREAL then directed SA Evertz to come to "26th grant" (26th Street and Grant Avenue). SA Evertz and I knew that VILLARREAL resided at 2202 South 26th Street, Milwaukee, WI, which is located at the intersection of 26th Street and Grant Avenue from the first drug transaction on April 5, 2021.

14

34.     At approximately 4:43 P.M., surveillance personnel observed two Hispanic males, later identified as Raheem RIVERA (RIVERA) and Erick R. RAMIREZ (RAMIREZ), arrive at VILLARREAL's residence in a red Mitsubishi SUV, bearing Illinois (IL) tag "CN95055." The RIVERA and RAMIREZ then entered VILLARREAL's residence. RAMIERZ possessed a white grocery bag.

35.     At approximately 5:04 P.M., SA Evertz arrived at 2202 South 26th Street. SA Evertz then texted VILLARREAL on her telephone number 414-248-0793 that SA Evertz had arrive. SA Evertz proceeded to wait for VILLARREAL outside her residence. VILLARREAL then emerged from the south side of the residence and greeted SA Evertz. VILLARREAL then invited SA Evertz inside. Upon entering the residence, SA Evertz observed RIVERA and RAMIREZ, manufacturing, commonly referred to as "cooking", suspected crack cocaine in the kitchen of VILLARREAL's residence (Figure 2). SA Evertz also observed several white grocery bags near RIVERA and RAMIREZ. After greeting RIVERA and RAMIREZ, SA Evertz proceeded to ask RIVERA if he was the "master chef," and RAMIREZ was his assistant. RIVERA responded, "We're just partners. Partners in crime."

36.     SA Evertz then waited inside VILLARREAL's residence as RIVERA and RAMIREZ finished preparing the ounce of purported crack cocaine for SA Evertz. Once the suspected crack cocaine ordered by SA Evertz had finished cooling, RIVERA packaged the substance in a grocery-produce bag and handed it to VILLARREAL (Figure 3 and Figure 4)). VILLARREAL then handed the substance to SA Evertz in exchange for $2,500 of previously recorded buy money. RIVERA and RAMIREZ then returned to manufacturing additional amounts of suspected crack cocaine.

15



*(Figure 2)*
*RIVERA (left) and RAMIREZ (right) in the process of manufacturing suspected crack cocaine in a pyrex measuring cup.*



*(Figure 3)*
*RIVERA packaging the suspected crack cocaine later purchased by SA Evertz.*

16



*(Figure 4)*
*VILLARREAL examining the suspected crack cocaine sold to SA Evertz.*

37.    After the operation, the substance was weighed and field-tested by ATF Agents. The substance weighed 30.74 grams(with packaging and field-tested positive for cocaine.

38.    On May 15, 2021, at approximately 10:02 A.M., VILLARREAL sent a photograph of a suspected firearm to SA Evertz via Instagram direct message using user yeya_v13. SA Evertz examined the photograph and identified the suspected firearm possessed characteristics identical to a Colt AR-15-style rifle (Figure 5). VILLARREAL then sent a message asking what kind of firearm was displayed in the photograph.


*(Figure 5)*
*Screenshot of the photograph sent by VILLARREAL to SA Evertz via Instagram direct message.*

39.     At the same time, VILLARREAL sent SA Evertz a text message using telephone number 414-248-0793 asking SA Evertz to check his direct messages on Instagram. SA Evertz then sent a text message to VILLARREAL stating the firearm looked like a "M4." SA Evertz also asked if VILLARREAL if she knew the individual selling the firearm. VILLARREAL responded, "I can find out." SA Evertz then explained if VILLARREAL arranged for SA Evertz to purchase the firearm, SA Evertz would pay VILLARREAL an amount of money for coordinating the transaction.

40.     Continuing on May 16, 2021, VILLARREAL posted a Snapchat Story of herself and her dog. SA Evertz responded directly to the Story and asked VILLARREAL where her dog was when SA Evertz met with VILLARREAL the prior week. VILLARREAL responded, "In his cage I think lol" VILLARREAL then stated, "Price 25" "U need" "Lmk (let me know) when to order." Based on training, experience and the ongoing investigation, SA Evertz and I understood this to mean VILLARREAL was informing SA Evertz that the price for an ounce of crack cocaine would be $2,500 the next time SA Evertz purchased narcotics from VILLARREAL.

**d. May 19, 2021 – 28.30 grams crack cocaine**

18

41.     Beginning on May 17, 2021, SA Evertz communicated with VILLARREAL via telephone calls using telephone number 414-248-0793 to coordinate and arrange the purchase of one ounce of crack cocaine from VILLARREAL. During the conversation, SA Evertz asked what VILLARREAL's availability would be for the upcoming week. VILLARREAL stated, in substance, that she could meet with SA Evertz at any time because VILLARREAL was not working due to VILLARREAL changing jobs. SA Evertz informed VILLARREAL SA Evertz planned to purchase one ounce of crack cocaine from VILLARREAL at her residence on Wednesday, May 19, 2021, or Thursday, May 20, 2021. When VILLARREAL asked SA Evertz what time SA Evertz planned to meet with VILLARREAL, SA Evertz informed her it would be around 5:00 P.M. VILLARREAL then stated, "Okay, I'll have it for you."

42.     On May 18, 2021, SA Evertz called VILLARREAL on telephone number 414-248-0793 and informed her that SA Evertz would be coming to VILLARREAL's residence the following day, May 19, 2021, sometime after 5:00 P.M., to obtain the ounce of crack cocaine from VILLARREAL. VILLARREAL responded, "I'll be ready."

43.     On May 19, 2021, SA Evertz called VILLARREAL on telephone number 414-248-0793 and informed VILLARREAL SA Evertz would be coming to VILLARREAL's residence soon to purchase the ounce of crack cocaine. VILLARREAL responded, "Yeah I gots it already." VILLARREAL then stated, "Just so you know, it is the same thing, but he said it came out to 26 instead of 28, so he's gonna charge a little less."  Based on training and experience SA Evertz and I understood this to mean the purported crack cocaine VILLARREAL would be selling to SA Evertz came from the same source of narcotics VILLARREAL utilized when she sold 30.74 grams of suspected crack cocaine to SA Evertz on May 12, 2021. Additionally, the substance weighed approximately 26 grams, as opposed to 28 grams, which is approximately one ounce, so the price

19

for the purported crack cocaine would be less than the $2,500 VILLARREAL had originally quoted.

44.    Continuing on May 19, 2021, at approximately 4:41 P.M., SA Evertz arrived at VILLARREAL's residence located at 2202 South 26th Street. VILLARREAL greeted SA Evertz at the back door and invited SA Evertz inside. VILLARREAL then led SA Evertz to her kitchen table, which is where VILLARREAL had a folded-up paper towel sitting on top of a clear plastic bag, next to a digital scale. Referencing the purported crack cocaine within the paper towel, VILLARREAL stated, "So he (VILLARREAL's source of narcotics) said when he bagged it up, it came out to 26. He said he'll charge 100 less." Based on training and experience, SA Evertz and I understood this to mean when VILLARREAL's source of narcotics packaged and weighed the purported crack cocaine, it weighed 26 grams, which is approximately two grams less than one ounce. Therefore, VILLARREAL's source of narcotics offered to sell the purported crack cocaine for $100 less than the $2,500 VILLARREAL originally stated the ounce would cost. After some negotiation on the price for the narcotics, SA Evertz provided VILLARREAL $2,360 in previously recorded buy money in exchange for the suspected crack cocaine.

45.    After purchasing the suspected crack cocaine, SA Evertz stated SA Evertz believed VILLARREAL was going to sell the suspected firearm VILLARREAL had sent to SA Evertz via Instagram on May 15, 2021. VILLARREAL responded, "I thought too! And he was like oh no! Someone sent it to me, and he said look I don't know what, what, what's what, so I'm not getting involved. I was like you lame you coulda made some money." SA Evertz then stated, in substance, that the firearm VILLARREAL sent SA Evertz was uncommon since it resembled a military-style firearm. VILLARREAL then stated, "But I think it's… been used already. So that… if it's been used I wouldn't have sold it." Based on training and experience, SA Evertz and I understood this

20

to mean the firearm had been used in a shooting, so the owner did not want to sell the firearm due to the possibility of being identified by law enforcement as an individual associated with the shooting.

46.    VILLARREAL then brought SA Evertz into her bedroom and retrieved a .22 caliber Smith & Wesson M&P-15 rifle from beside her dresser (Figure 6). VILLARREAL then handed the firearm to SA Evertz so SA Evertz could inspect the rifle. As SA Evertz was in the process of manipulating the firearm, VILLARREAL showed SA Evertz the loaded magazine and stated, "Nice long clip too." When SA Evertz asked about the origin of the firearm, VILLARREAL stated, "One of my guys gave it to me cuz he had bought it off the black market. It's his only unregistered gun."


*(Figure 6)*
*VILLARREAL showing her firearm to SA Evertz*

47.    After VILLARREAL finished showing the rifle to SA Evertz, SA Evertz asked if VILLARREAL could obtain another half-ounce of crack cocaine for SA Evertz at that time. VILLARREAL then grabbed her cell phone and stated, in substance, that she would contact her

21

source of narcotics. VILLARREAL then stated her source was a "cook," and he would be at work until 9:00 P.M., however; her source may be able to have one of his associates obtain the half-ounce and provide it to VILLARREAL.

48.     SA Evertz and VILLARREAL then returned to the kitchen and engaged in general conversation. During the conversation, VILLARREAL placed her phone on the kitchen table and SA Evertz observed the Snapchat application was open on her phone. VILLARREAL then picked her phone up and continued to utilize the device. Several minutes later, VILLARREAL informed SA Evertz that her source's associate could not deliver the crack cocaine because the associate was in Chicago. When SA Evertz stated he would return at a later date to pick up the crack cocaine, VILLARREAL stated, "Just let me know and I'll have it ready."

49.     After the operation, ATF Agents weighed and field-tested the suspected crack cocaine. The substance weighed 28.30 grams, total package weight and field-tested positive for cocaine.

50.     On May 19, 2021, at approximately 8:46 P.M., SA Evertz called VILLARREAL on telephone number 414-248-0793 and informed her that the crack cocaine SA Evertz had purchased from VILLARREAL earlier that day was several grams short of one ounce. VILLARREAL stated, "Yeah Imma definitely get that corrected." SA Evertz made up the fact that the weight was several grams short of an ounce as a ruse to continue conversation with VILLARREAL.  The true weight was 28.30 gram (total package weight).

### e. June 10, 2021 – 55.81 grams crack cocaine

51.     On June 9, 2021, SA Evertz communicated with VILLARREAL and asked if she VILLARREAL would be able to provide two ounces of crack cocaine to SA Evertz the following day. VILLARREAL replied that she could sell the two ounces to SA Evertz at a rate of $2,400 per

ounce. After negotiations, VILLARREAL ultimately agreed to sell both ounces of crack cocaine to SA Evertz for $4,400 or $2,200 per ounce. VILLARREAL and SA Evertz then agreed to conduct the transaction the following afternoon.

52.    On June 10, 2021, at approximately 3:23 P.M., SA Evertz sent VILLARREAL a text message asking if SA Evertz could come to VILLARREAL's house at that time to purchase the two ounces of crack cocaine. VILLARREAL replied, "Yes sir."

53.    On June 10, 2021, at approximately 4:05 P.M., SA Evertz arrived at VILLARREAL's residence and texted VILLARREAL to notify her that SA Evertz had arrived. Several moments later, VILLARREAL emerged from the south side of the residence and stood in the back yard. SA Evertz then greeted VILLARREAL and both parties entered VILLARREAL's residence.

54.    Upon entering the residence, VILLARREAL informed SA Evertz that she had changed jobs and was currently working the overnight shift at FedEx. VILLARREAL then opened her dresser drawer and removed a digital scale along with a clear, corner-cut, plastic bag, containing suspected crack cocaine.

55.    SA Evertz then provided VILLARREAL $4,400 in pre-recorded ATF buy money in exchange for the suspected crack cocaine, and VILLARREAL proceeded to count out the money in front of SA Evertz (Figure 7).



*(Figure 7)*
*VILLARREAL counting the $4,400 in* ATF buy money *provided to her by SA Evertz in exchange for the suspected crack cocaine.*

56.    After VILLARREAL finished counting the money, SA Evertz asked VILLARREAL if the price for the crack cocaine could be reduced for the next transaction. VILLARREAL replied, "I'm gonna try to get him to come down, yeah." SA Evertz explained SA Evertz would like to pay less for the narcotics; however, SA Evertz did not have an issue paying more for VILLARREAL's product because SA Evertz appreciated the efficient transactions. VILLARREAL replied, "Yeah that's why he likes you too."

57.    VILLARREAL's daughter then came into the bedroom with VILLARREAL's cell phone and informed VILLARREAL that VILLARREAL had an incoming call. VILLARREAL then turned to her daughter to grab the phone, which was still ringing. When VILLARREAL grabbed the phone, SA Evertz observed the caller was "E Rams." During a previous transaction between VILLARREAL and SA Evertz, Erick RAMIREZ was manufacturing suspected crack

24

cocaine in the kitchen of the VILLARREAL's residence with Raheem RIVERA. During the transaction, RAMIREZ introduced himself to SA Evertz as "E." VILLARREAL declined the call and immediately opened her snapchat application. VILLARREAL then began typing a message to a snapchat user as she turned back towards SA Evertz.

58.     After the operation, ATF Agents weighed and field-tested the suspected crack cocaine. The substance weighed 55.81 grams (total package weight) and field-tested positive for cocaine.

**f. July 28, 2021 – 51.55 grams crack cocaine**

59.     In the days leading up to July 28, 2021, SA Evertz communicated with VILLARREAL via Snapchat to coordinate the purchase of two ounces of crack cocaine from VILLARREAL. VILLARREAL agreed to sell two ounces of crack cocaine to SA Evertz for $4,200 or $2,100 per ounce.

60.     On July 28, 2021, at approximately 1:53 P.M., ATF SAs Evertz and Daniel Bowling traveled to 2202 South 26th Street, Milwaukee, WI, to purchase the two ounces of crack cocaine that had been previously ordered by SA Evertz. After arriving at the residence, the SAs met with VILLARREAL inside her bedroom.

61.     After engaging in general conversation, SA Bowling stated he was with SA Evertz on behalf of the president of the SAs' criminal organization, a fictitious undercover criminal organization. SA Bowling stated the SAs' criminal enterprise was looking to expand into the crack cocaine market and would like to speak to VILLARREAL's source for crack cocaine to discuss the possibility of purchasing larger quantities of crack cocaine moving forward. After listening to SA Bowling, VILLARREAL responded, "I can talk to him. See what they say." SA Bowling then asked if VILLARREAL would have to speak to her source in person or if she would be able to call

25

them. VILLARREAL stated that her source was currently "at work" but VILLARREAL would speak with "him" later that day.

62. SA Bowling continued to explain that the SAs would be wanting to purchase quarter-kilogram to half-kilogram quantities of crack cocaine per future transaction. SA Bowling then asked if VILLARREAL's source would be able to provide those amounts. VILLARREAL nodded her head in agreement and then stated her source would also be able to obtain firearms for SA Bowling and his associates. VILLARREAL then explained she believed her source would be willing to meet with the SAs because her source had previously met SA Evertz and has appreciated SA Evertz's business. Based on the investigation, SA Evertz had only previously meet with RIVERA and RAMIREZ during a prior undercover controlled buy. VILLARREAL then nodded towards SA Evertz and stated, "He's (SA Evertz) the only one who's ever actually seen anyone in person." SA Evertz understood this to mean SA Evertz is the only one of VILLARREAL's associates who has met with VILLARREAL's source of supply.

63. SA Bowling then asked VILLARREAL if she could contact her source while SA Bowling was with VILLARREAL. VILLARREAL responded that her source was at work and that "He's a cook." VILLARREAL then opened her iPhone and began switching between Snapchat, Instagram, and text message conversations as she attempted to find her source's telephone number (Figure 8). While doing this, at approximately 2:09 P.M., SA Evertz observed VILLARREAL open her Instagram application and send a message to another Instagram user.

64. VILLARREAL then stated, "Okay I just messaged him, so I'm just waiting for him to get back to me." VILLARREAL then explained she believed the meeting between SA Bowling and her source would be appropriate because "Those type of decisions do gotta go through (him)." Based on training, experience and the investigation SA Evertz understood this to mean if SAs

26

Evertz and Bowling purchased large amounts of crack cocaine, they would need to deal with VILLARREAL's source directly.

65.     SA Bowling then asked VILLARREAL if she would be okay with arranging the meeting. VILLARREAL again confirmed she was okay with the proposition given to her by SA Bowling. SA Bowling then commented that VILLARREAL looked deep in thought, to which VILLARREAL countered, "I'm high. I haven't taken a nap today."



*(Figure 8)*
*Screenshot from the recording of VILLARREAL looking through past text message conversations in an attempt to locate her source's telephone number.*

66.     SA Evertz then asked VILLARREAL to provide SA Evertz with the two ounces of crack cocaine SA Evertz had come to purchase. VILLARREAL instructed SA Evertz the substance was on her bed behind SA Evertz. SA Evertz then turned and observed a large amount of suspected crack cocaine in a clear, plastic bag on VILLARREAL's bed. SA Evertz then utilized VILLARREAL's digital scale to weigh the substance. VILLARREAL's scale identified the substance weighed approximately 51 grams with packaging. SA Evertz then informed VILLARREAL that the substance was several grams short of the two ounces SA Evertz had

27

ordered. VILLARREAL then took the substance out of the packaging and placed the suspected

crack cocaine on the scale, which identified the substance weighed approximately 50 grams

without packaging (Figure 9).



*(Figure 9)*
*Screenshot from the recording of VILLARREAL weighing the suspected crack cocaine.*

67.     After weighing the substance, VILLARREAL placed the suspected crack cocaine

back in the packaging and stated she would not charge SA Evertz $4,200 for the substance since

it weighed less than the agreed upon amount. VILLARREAL then stated she believed the

substance was less than two ounces because she had sold some of the suspected crack cocaine to

another individual "a little while ago."

68.     SA Evertz then asked if VILLARREAL would accept $3,000 for the remaining

amount of suspected crack cocaine, approximately 51 grams. VILLARREAL accepted SA Evertz'

offer, and SA Evertz counted out $3,000 in ATF buy money, which was then provided to

VILLARREAL.

69.     At approximately 2:19 P.M., VILLARREAL grabbed her iPhone and stated she was trying to get ahold of "him", VILLARREAL's source, to inform her source that the substance was short on weight. VILLARREAL then made an outgoing call. An individual immediately answered and VILLARREAL instructed the individual, "Send me cuz's number. Look at your messages." VILLARREAL then ended the call and opened her text messages and scrolled through her past text message conversations in an effort to locate her source's telephone number.

70.     At approximately 4:26 P.M., VILLARREAL made another outgoing call. SA Bowling asked if VILLARREAL found her sources number, to which VILLARREAL responded, "Yeah." After several rings, VILLARREAL hung up and stated, "I think he's at work." At approximately 2:27 P.M., VILLARREAL received an incoming call. VILLARREAL informed the caller, "So it weighed out at fifty. He (SA Evertz) wants to know if you have more (crack cocaine) on you." VILLARREAL then informed her source that "they" (SAs Evertz and Bowling) want to purchase larger quantities and would like to have a sit-down meeting to discuss the terms of the narcotics proposition.

71.     VILLARREAL then spoke with her source for a few additional moments and hung up. VILLARREAL stated that her source could not meet that afternoon because her source would be at his job until approximately 9:00 P.M. VILLARREAL then stated she would meet with her source later that evening once he was done with work to further discuss the meeting between the SAs and her source. VILLARREAL then added that her source confirmed "he" (source) would be willing to do a "sit-down" with the SAs.

72.     VILLARREAL then stated, in substance, that she used to sell narcotics to another individual who also wanted to meet with her source, but she did not coordinate that meeting;

however, because her source had met SA Evertz and liked SA Evertz, VILLARREAL was motivated to have the sit-down meeting take place.

73.     VILLARREAL then informed SA Evertz that she was losing money by selling the remaining suspected crack cocaine to SA Evertz for $3,000. SA Evertz then stated he would provide VILLARREAL with an additional $200 for making the transaction happen and provided VILLARREAL with an additional $200 in ATF buy money.

74.     After the operation, ATF Agents weighed and field-tested the suspected crack cocaine. The substance weighed 51.55 grams, total package weight, and field-tested positive for cocaine.

### D.  Attempts to Meet with RAMIREZ (VILLARREAL's Source of Crack Cocaine)

75.     On July 28, 2021, SA Evertz requested to meet directly with VILLARREAL's sources of crack cocaine.  Several hours after the operation on July 28, 2021, VILLARREAL called SA Evertz; however, SA Evertz did not answer. At approximately 9:45 P.M., VILLARREAL sent SA Evertz the following text message from telephone number 414-248-0793: "Call me." Due to a lack of cellular service, SA Evertz and VILLARREAL exchanged several calls with each other over the next five minutes before SA Evertz was able to successfully answer VILLARREAL's incoming call at 9:50 P.M. VILLARREAL asked SA Evertz "Are you available for a little date on Friday (July 30, 2021)?" VILLARREAL then stated, regarding the meeting between the SAs, VILLARREAL, and VILLARREAL's source: "It's a go." VILLARREAL then stated, in substance, that her source of supply had agreed to meet with the SAs and wanted to have the meeting occur on July 30, 2021. SA Evertz then told VILLARREAL SA Evertz would speak with SA Evertz's associates to confirm the date of the meeting and would then get back to VILLARREAL with an answer.

76.     On July 29, 2021, at approximately 8:47 P.M., SA Evertz called VILLARREAL and stated SA Evertz' associates could not meet on July 30, 2021; however, they would be able to meet on August 2, 2021. VILLARREAL then stated, in substance, that she would speak with her source and get back to SA Evertz with an answer regarding if the meeting on August 2, 2021, would work for her source. Over the course of the next three days, July 30, 2021, July 31, 2021, and August 1, 2021, SA Evertz contacted VILLARREAL several times to inquire if her source would be able to meet on August 2, 2021.  Each time SA Evertz contacted VILLARREAL, VILLARREAL stated that her source had not let VILLARREAL know if he (source) would be able to meet on that date.

77.     On August 1, 2021, at approximately 11:21 A.M., SA Evertz texted VILLARREAL to ask if SA Evertz and his associates could meet with VILLARREAL and her source after her source was finished working on August 2, 2021. VILLARREAL responded, "Let me see;" however, VILLARREAL did not get back to SA Evertz.

78.     On August 2, 2021, at approximately 2:28 P.M., SA Evertz called VILLARREAL and stated SA Evertz was currently with his associates and was wondering if they could meet with VILLARREAL later that day. VILLARREAL stated, in substance, that she had her child with her, but SA Evertz could stop by later her residence later that day.

79.     Continuing on August 2, 2021, at approximately 6:51 P.M. and 7:00 P.M., SA Evertz called VILLARREAL; however, VILLARREAL did not answer. At approximately 7:04 P.M., VILLARREAL texted SA Evertz, "Out with family rn (right now)." SA Evertz and VILLARREAL then exchanged text messages to discuss SA Evertz and his associates meeting with VILLARREAL. At approximately 8:04 P.M., VILLARREAL called SA Evertz and stated

31

she would be back to her residence in 20 minutes and SA Evertz could come to her residence at that time.

80.     At approximately 8:38 P.M., ATF SAs Evertz, Bowling, Mike Aalto, and John Carr departed the staging location in undercover vehicles (UCVs) as they were followed by a designated cover team. SAs Evertz, Bowling, Aalto, and Carr were equipped with audio-/video-recording/transmitting devices and an amount of pre-recorded ATF by money. At approximately 9:00 P.M., the SAs arrived at VILLARREAL's residence and observed VILLARREAL parked in a dark-colored Honda sedan on 26th street, just south of VILLARREAL's residence. SA Evertz then parked his UCV and approached VILLARREAL's car to greet VILLARREAL. VILLARREAL stated, in substance, that she was in a hurry and she could not meet with the SAs inside of her residence. SA Evertz then asked VILLARREAL if SA Evertz could join VILLARREAL in her car, to which VILLARREAL agreed. SA Evertz then entered the front passenger seat of VILLARREAL's car and SA Bowling stood outside the driver's window, which was rolled down. At this time, SAs Aalto and Carr stood outside their UCV, which was parked approximately fifteen yards north of VILLARREAL's car.

81.     SA Evertz then explained that the individuals who were accompanying SA Evertz were SA Evertz' associates from Detroit. SA Evertz explained he and his associates wished to continue discussions of potential bulk-narcotics purchases that occurred on July 28, 2021. VILLARREAL then responded that she still had not heard back from her narcotics source. VILLARREAL stated, "I don't really have an answer though. I'm still waiting on them." Based on the investigation, SA Evertz understood this to mean VILLARREAL's source and his associates were in the process of discussing whether to enter discussions regarding the purchase of large amounts of crack cocaine by SA Evertz and SA Evertz's associates.

32

82.    SA Evertz then asked what VILLARREAL's source had said when VILLARREAL proposed SA Evertz and SA Evertz's associates entering into expanded business with VILLARREAL's source. VILLARREAL responded, "He just said he was gonna look into it and talk to everybody. Not everybody actually resides in the same area, so, that's the only thing." Based on training, experience and the investigation, SA Evertz understood this to mean VILLARREAL's source must speak with other members of his (source's) enterprise prior to making any decisions.

83.    SA Evertz then asked VILLARREAL how her source felt about meeting with SA Evertz and SA Evertz's associates. VILLARREAL responded, "It seemed like he was pretty for it he just has to make sure everything in line. And at that point there's not much I can do except wait for him to tell me."

84.    At approximately 8:02 P.M., SA Bowling informed VILLARREAL that the president of the SA's motorcycle club, fictitious undercover club, had come from Detroit to meet with VILLARREAL and her source. SA Carr then walked over to VILLARREAL's vehicle and SA Evertz exited the front passenger seat to allow VILLARREAL to speak with SA Carr. SA Evertz then walked around the rear of the vehicle and entered the rear driver-side door and shifted over to sit in the rear-middle seat.

85.    Upon entering the vehicle, SA Carr stated he had come to speak with VILLARREAL because the SAs' motorcycle club was founding a new chapter in Milwaukee. SA Carr then stated, in substance, that SA Carr wanted to verify, first-hand, that the individuals SA Evertz had been doing business with (VILLARREAL and her source) were individuals the SAs' club would benefit from dealing with. VILLARREAL then stated, in substance, that her source

33

was in a similar position, and he (source) wanted to verify the SAs' club legitimacy prior to engaging in discussions regarding the sale of large amounts of narcotics.

86.      SA Evertz then asked VILLARREAL if she could contact her source and ask him to meet with the SAs at that time because the SAs would only be in Milwaukee for the night. VILLARREAL then asked SA Evertz to give her 30 minutes to contact her source. VILLARREAL added that her source was currently at work, but he would be getting off soon. SA Evertz then asked if VILLARREAL could call her source at that time due to the SAs' rigid time constraints.

87.      VILLARREAL then grabbed her phone and began going scrolling through her text message conversations. VILLARREAL expressed she did not think her source would get back to respond to her in a timely fashion due to her source being at work. SA Evertz then asked why VILLARREAL's source responded to her when she contacted him (source) via telephone during the prior transaction, July 28, 2021. VILLARREAL stated he (source) responded quickly at that time because she had "messaged" her "cousin" and asked her "cousin" to reach out to the source, so he (source) would know VILLARREAL would be contacting him.

88.      SA Evertz then observed VILLARREAL open a text message conversation with an individual utilizing telephone number 414-803-0040. The contact was not saved in VILLARREAL's iPhone with a custom name; therefore, the telephone number was visible at the top of the text message conversation where the "contact name" would normally be displayed.

89.      SA Evertz then observed VILLARREAL send a text message to 414-803-0040, VILLARREAL's source, asking him to let VILLARREAL know when he would be off work because the SAs were in Milwaukee to meet with him (Figure 10). VILLARREAL then stated that she believed her source would want to wait before meeting with the SAs because he (source) was being cautious of who he meets with. VILLARREAL stated, "He just wants to make sure he's not

34

walking into anything." SA Evertz then reiterated that the SAs simply wanted to have a discussion about purchasing more narcotics with VILLARREAL's source and were not looking for her source to commit to anything at that time. SA Evertz then observed the source text VILLARREAL back several moments later indicating he was at work.



*(Figure 10)*
*VILLARREAL communicating with her source, telephone number 414-803-0040, via text message.*

90.     As the parties waited for VILLARREAL's source to reply, SA Evertz offered to buy VILLARREAL's .22 caliber rifle in an effort to provide VILLARREAL with money to put towards her massage therapy tuition. VILLARREAL she could not sell the firearm to SA Evertz because she needed the firearm. SA Evertz then asked VILLARREAL to contact SA Evertz if she decided to eventually sell the firearm. VILLARREAL then stated, "I'll let you know… I might." SA Evertz suggested obtaining a smaller firearm for her protection instead of a rifle and VILLARREAL responded she liked "having something bigger for the house."

91.     VILLARREAL then updated the SAs and stated she was still waiting for a response from her source. VILLARREAL stated she sent an additional message to him (source) asking if he could meet when he was done with work. At approximately 9:16 P.M., VILLARREAL received a text message from her source and VILLARREAL informed the SAs that he (source) told VILLARREAL he "has running around to do after (work)." At approximately 9:17 P.M., VILLARREAL sent her source a text message explaining the SAs only wanted to discuss business and were not looking to conduct any transactions.

92.     At approximately 9:21 P.M., VILLARREAL received a text message from her source. After reading the text message, VILLARREAL stated, "He said that's fine." In this context, SA Evertz understood this to mean VILLARREAL's source would be okay with meeting the SAs to discuss possible bulk-narcotics transactions.

93.     SA Evertz was then able to read the last text message sent from the source and observed he (source) had texted VILLARREAL "*Okay \*thumbs up emoji\*"*. At approximately 9:21 P.M., VILLARREAL sent the source a text message. VILLARREAL then stated she had just asked him to provide her with a time and location that he could meet the SAs.

94.     At approximately 9:22 P.M., VILLARREAL received a text message from her source. VILLARREAL read the text message and then summarized what her source had sent. VILLARREAL explained, "So his thing is. He still has to talk to his people because he hasn't heard of the (SA's) club before." Based on training, experience, and the investigation, SA Evertz understood this to mean VILLARREAL's source wanted to speak with his associates before meeting with the SAs. Additionally, VILLARREAL's source wished to wait before meeting because he (source) was in the process of verifying the SA's motorcycle club was a legitimate organization.

95.    SA Evertz then stated the SAs' organization did not have a presence in Milwaukee; therefore, it would make sense that her source had never heard of the SAs' motorcycle club. VILLARREAL then stated, in substance, that her source has connections in Detroit, and they were in the process of verifying the SAs club's legitimacy.

96.    After waiting several minutes, SA Evertz exited the back seat of VILLARREAL's car and stood outside the driver's-side window with SA Bowling. At this time, VILLARREAL stated that her source was being "cautions" about meeting with the SAs because it had been "hot" in Milwaukee. When asked what that meant, VILLARREAL explained her source was taking extra precautions because the "feds" had recently arrested several individuals.

97.    The SAs then indicated that they would be leaving and asked VILLARREAL to contact them once VILLARREAL had heard back from her source. VILLARREAL confirmed she would contact SA Evertz when she heard back from her source so the meeting could take place. SA Evertz then removed an amount of ATF buy money from his pocket and counted out $200. SA Evertz then handed the $200 to VILLARREAL and explained SA Evertz had been directed to provide VILLARREAL with the money by the club's president for attempting to coordinate the meeting. SA Evertz then informed VILLARREAL she would be provided with additional monies once the meeting took place. At approximately 9:30 P.M., the four SAs departed the residence.

98.    Continuing on August 2, 2021, at approximately 10:21 P.M., VILLARREAL texted SA Evertz and stated she still had not heard back from her source. VILLARREAL also stated she would continue her efforts to contact her source and let SA Evertz know when she had heard back.

99.    On August 3, 2021, Drug Enforcement Agency (DEA) Task Force Officer (TFO) Dwain Monteilh requested basic subscription information from T-Mobile USA for records associated with telephone number 414-803-0040. On August 5, 2021, TFO Monteilh received the

requested information from T-Mobile USA. Per the T-Mobile records, effective May 2, 2021, the subscriber listed to the billing address is "Erick Ramis" with an address of 2029 30th Street, Milwaukee, WI 53215.

### E. Identification of RAMIREZ and Residence 1139 South 23rd Street

100. Following the undercover controlled buy on May 12, 2021, case agents continued surveillance of VILLARREAL's residence. Approximately fifteen minutes after SA Evertz departed VILLARREAL's residence, law enforcement personnel observed RAMIREZ and RIVERA exit VILLARREAL's residence, enter the red Mitsubishi SUV, bearing Illinois (IL) tag "CN95055". RAMIREZ and RIVERA then drove to 1139 South 23rd Street, Milwaukee, WI. After arriving at the address, RAMIREZ and RIVERA entered the residence.

101. Based on this information ATF Agents were able to query open-source databases and observe that RAMIREZ is associated with this address. Also associated with this address was Maria E Ramirez. During the investigation, case agents learned Maria E. Ramirez is RAMIREZ's mother. This information was obtained through the Wisconsin Department of Corrections (DOC) and also verified by VILLARREAL. SA Evertz reviewed a Wisconsin Department of Transportation (DOT) photograph of RAMIREZ and immediately recognized RAMIREZ. According to RAMIREZ's DOT record, RAMIREZ lists 1139 South 23rd Street, Milwaukee WI as his address.

102. On December 2, 2021, SA Evertz conducted surveillance of 1139 South 23rd Street, Milwaukee, WI, the residence in which RAMIREZ and RIVERA were observed entering following the undercover controlled buy conducted by SA Evertz on May 12, 2021. At approximately 10:57 A.M., SA Evertz observed RAMIREZ and another Hispanic male, enter the residence of 1139 South 23rd Street. SA Evertz observed the Hispanic male utilized a set of keys

38

to unlock the front door before they entered the residence (Figure 11). SA Evertz also observed RAMIREZ leaving the residence of 1139 South 23rd Street at approximately 11:30 A.M.



*(Figure 11)*
*RAMIREZ (left) opening the security/storm door of 1139 South 23rd Street*

103.    As part of the investigation into the drug trafficking of VILLARREAL and RAMIREZ, law enforcement learned that RAMIREZ is on probation with Wisconsin DOC, for two counts of fourth degree sexual assault and one count of child abuse. Law enforcement spoke to RAMIREZ's probation agent and learned his reported residence is 1017 South 22nd Street, which is one block away from 1139 South 23rd Street, where law enforcement observed RAMIREZ following the undercover controlled buy on May 12, 2021, and then again during surveillance on December 2, 2021. RAMIREZ's probation agent indicated RAMIREZ reported

living at 1017 South 22nd Street with his grandmother. RAMIREZ's probation agent also report RAMIREZ is employed as a cook at Barnacle Buds, which is consistent with statements made by VILLARREAL that her crack cocaine supplier was a cook. SA Erlien spoke with RAMIREZ's probation agents supervisor, who supervised RAMIREZ before his current agent, and she advised SA Erlien that she believed RAMIREZ was unable to list 1139 South 23rd$^d$ St as his residence with probation because RAMIREZ has a younger brother who lives there that is a minor, and therefore RAMIREZ is prohibited from living at that house.

104.    On December 7, 2021 case agents conduct a trash pull at the residence of 1139 South 23rd Street and located receipts with the name Maria Ramirez, RAMIREZ's mother's name.

### F. Mirandize Statement of VILLARREAL

105.    On October 14, 2021 personnel from the ATF and Hales Corners Police Department Officers conducted a traffic stop of VILLARREAL and transported VILLARREAL to the ATF Milwaukee Field Office. SA Evertz met with VILLARREAL and introduced himself has a special agent of the ATF, not a drug dealer nor member of a cocaine selling motorcycle gang. SA Evertz disclosed the drug trafficking investigation and controlled buys in which VILLARREAL was recorded participating in. SA Evertz then reviewed ATF Form 3200.4 (Advice of Rights and Waiver) with VILLARREAL. The form and VILLARREAL's rights were reviewed with her and VILLARREAL voluntarily waived her rights. VILLARREAL confirmed she had sold crack cocaine to SA Evertz on several occasions. VILLARREAL stated, except for the "tester", all the other crack cocaine sold to SA Evertz was provided from RAMIREZ. VILLARREAL stated that when SA Evertz would contact VILLARREAL to purchase crack cocaine, VILLARREAL contacted RAMIREZ to supply her with the amount of crack cocaine SA Evertz had ordered. RAMIREZ would then "front" the narcotics to VILLARREAL, who would pay RAMIREZ back

within one week. Your Affiant knows through training and experience that "fronting" occurs when a supplier of narcotics provides an amount of narcotics to a customer on credit, with the expectation the customer will pay the supplier back after the customer has obtained the funds to pay off the drug debt. RAMIREZ charged VILLARREAL $1,800 for an ounce of cocaine. VILLARREAL stated that RAMIREZ and RIVERA utilized VILLARREAL's residence to manufacture crack cocaine only on May 12, 2021. VILLARREAL also verified that RAMIREZ lives at the intersection of Scott and South 23rd Street with his mother. It should be noted that 1139 South 23rd Street is located on the North/West corner of West Scott Street and South 23rd Street.

106. On November 24, 2021 VILLARREAL had a telephone conversation with SA Evertz regarding the investigation and status of possible charges. On November 25, 2021 VILLARREAL text message SA Evertz regarding the investigation and texted "I called to find out what the due process and arrest day will look like for it seems like I have no travel restrictions and may consider leaving the country to work on my tan so if you plan on rading my home please leave the suntan lotion behind."

## IV. AUTHORIZATION REQUEST

107. Case agents believe, based on the facts contained within this affidavit, that there is probable cause to believe that **1139 South 23rd Street, Milwaukee, Wisconsin** has been and is continuing to be used as part of RAMIREZ and others efforts to distribute, and possess with intent to distribute, cocaine, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(B). Based on the foregoing, there is probable cause to believe that located within **1139 South 23rd Street, Milwaukee, Wisconsin**, there is evidence pertaining to the fruits, instrumentalities, and proceeds of drug trafficking, all of which are detailed more specifically in Attachment B, Items to be Seized.

108.    I further request that the Court order that all documents related to this submission be sealed until further order of the Court.   These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.   Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

**PLACE TO BE SEARCHED**

**1139 South 23rd Street, Milwaukee, Wisconsin:** This address is utilized by Erick R. Ramirez. Described as a two story, single family residence, having light tan vinyl siding on the first story and yellow vinyl siding on the second story, with white trim and light green front porch. The numbers ""1139"" are displayed in a vertical fashion on the east face of the residence. The front door is located on the east face of the residence. Pictures of the residence exterior follows:





## ATTACHMENT B

## ITEMS TO BE SEIZED

All records relating to violations of 21 U.S.C. §§ 841(a)(1), including but not limited to:

> All bank records, checks, credit card bills, account information, and other financial records;

> Financial records, documents, statements, or other evidence of control of bank or other financial accounts and investment funds;

> Lists of drug customers and related identifying information;

> Types, amounts, and prices of drugs trafficked, as well as dated, places, and amounts of specific transactions;

> Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

> Indicia of residency;

> Safes, vaults, or lock boxes used to store proceeds or records from these crimes;

> U.S. Currency; and

> Cellular telephones and all electronic storage areas on the device including stored telephone numbers, recently called numbers list, text messages, digital audio and or video recordings, pictures, settings, and any other user defined settings and/ or data.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).